IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CANDACE J. RODGERS,<br><br>      Plaintiff,<br><br>vs.<br><br>THE CHARTWELL LAW OFFICES, LLP,<br><br>      Defendant. | Case No.:<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND JURY DEMAND

### PRELIMINARY STATEMENT

1. This is an action for damages and equitable relief brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"), and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., as amended ("ADA"), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") to redress unlawful employment discrimination, retaliation, hostile work environment, and constructive discharge.

2. Plaintiff Candace J. Rodgers ("Ms. Rodgers" or "Plaintiff"), an experienced African American female attorney over the age of forty (46) with currently twenty (20) years of legal experience, significant ties to the legal and local community, and a documented disability (uterine leiomyomas requiring

surgical intervention), was subjected to systematic discrimination, harassment, and retaliation by Defendant The Chartwell Law Offices, LLP ("Chartwell" or "Defendant"), culminating in her constructive discharge on September 5, 2023.

3. Despite Ms. Rodgers outperforming her supervisors at times in billable hours and receiving client accolades, she was the only attorney in Chartwell's Atlanta office placed on a Performance Improvement Plan, while similarly situated and lower-performing Caucasian and younger attorneys received support, accommodations, and opportunities denied to Ms. Rodgers.

4. This case presents a textbook example of intersectional discrimination, where an employer's purported commitment to diversity and inclusion was betrayed by its actual treatment of a Black female attorney, with a disability, who was subjected to impossible standards, denied reasonable accommodations required by law, and ultimately forced out through a campaign of retaliation after she raised concerns about discriminatory treatment.

## **JURISDICTION AND VENUE**

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the unlawful employment practices complained of herein were committed within the Northern District of Georgia, and the employment records relevant to such practices are maintained and administered in this District. Specifically,

Defendant, The Chartwell Law Offices, LLP maintains its Atlanta office at 3200 Cobb Galleria Parkway, Suite 250, Atlanta, Georgia 30339, which is located within this judicial district.

7.  Plaintiff has satisfied all administrative prerequisites for bringing this action. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 18, 2023, assigned Charge No. 410-2023-09635, alleging race discrimination, age discrimination, and retaliation. [Exhibit A]. Plaintiff subsequently filed an Amended Charge addressing disability discrimination under the ADA, asserting that Defendant discriminated against her because of her actual or perceived disability. [Exhibit B].

8.  Plaintiff has satisfied all administrative prerequisites for bringing this action. The EEOC issued its Dismissal and Notice of Rights to Plaintiff on July 1, 2025, granting Plaintiff's request for a Notice of Right to Sue after more than 180 days had passed since the filing of the charge. [Exhibit C]. This Complaint is timely filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue, as the 90-day filing deadline expires on or about September 29, 2025. All conditions precedent to the institution of this lawsuit have been fulfilled, and Plaintiff has exhausted all required administrative remedies.

## **PARTIES**

9.  Plaintiff Candace J. Rodgers is an African American female, born in 1979, who at all relevant times was over the age of forty (40) and qualified to perform the essential functions of her position with or without reasonable accommodation.

10. Ms. Rodgers is a licensed attorney in good standing with the State Bar of Georgia, with currently twenty (20) years of legal experience in practice areas

including workers' compensation, real estate, medical malpractice, personal injury, general liability, litigation, and insurance defense.

11. Ms. Rodgers is a proud alumna of Emory University School of Law, graduating in May 2004, and Spelman College, graduating *cum laude* in May 2001, where she continues to mentor current students

12. At all relevant times, Ms. Rodgers was an individual with a disability as defined by the Americans with Disabilities Act, having been diagnosed with Leiomyomas (uterine fibroids) and experiencing substantial limitations in major life activities, or alternatively, was regarded as having such a disability by Defendant.

13. Defendant The Chartwell Law Offices, LLP ("Chartwell") is a limited liability partnership organized under the laws of Pennsylvania, with its principal place of business located at 700 American Avenue, Suite 303, King of Prussia, Pennsylvania 19406, conducting business in Georgia with offices located at 3200 Cobb Galleria Parkway, Suite 250, Atlanta, Georgia 30339.

14. At all relevant times, Defendant is a national law firm maintaining approximately twenty-nine (29) offices across thirty (30) states, employing approximately 235 licensed attorneys and support staff, including 35 attorneys and 23 staff members in its Atlanta office during the relevant period.

15. At all relevant times, Defendant employed more than fifteen (15) employees and is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), the Age Discrimination in Employment Act, 29 U.S.C. § 630(b), and the Americans with Disabilities Act, 42 U.S.C. § 12111(5).

## FACTUAL ALLEGATIONS

16. In March 2022, Ms. Rodgers was actively recruited by Whitney Lay Greene ("Greene"), then a Partner at Drew Eckl & Farnham ("DEF"), during a jury trial in which they were opposing counsel.

17. Greene presented numerous opportunities to Ms. Rodgers, including the prospect of becoming a Partner at DEF within one (1) year, based on Ms. Rodgers' extensive background and approximately eighteen (18) years of legal experience at the time.

18. In Greene's efforts to recruit Ms. Rodgers, she made significant references to Douglas Burrell ("Burrell"), an Equity Partner at DEF. Greene spoke in great detail about Burrell's role in her success and partnership at DEF, which played a pivotal role in Ms. Rodgers' decision to join DEF.

19. To further entice Ms. Rodgers to join DEF, Greene also organized a lunch with Lara Ortega Clark ("Clark") in order for Ms. Rodgers to hear Clark's story about her experience at DEF and to sell DEF to Ms. Rodgers as a wonderful place to work.

20. On May 6, 2022, Ms. Rodgers received an offer of employment from Drew Eckl & Farnham for an Of Counsel position, which she accepted based on Greene's representations regarding partnership opportunities and professional development.

21. However, in June 2022, Greene and numerous other attorneys, including Clark, transitioned from Drew Eckl & Farnham to Chartwell Law Offices. Yet, this previously organized transition plan was not communicated to Ms. Rodgers prior to her acceptance and joining DEF. Rather, Greene informed Rodgers on the morning of her third (3rd) day working at Drew Eckl & Farnham.

22. Specifically, Greene informed Ms. Rodgers she could stay at Drew Eckl by herself, or try to make her own deal with Chartwell Law Offices and go with everyone else, which included Burrell. This placed Ms. Rodgers at an incredible disadvantage. She knew nobody at DEF and had legitimate concerns about staying considering the mass Exodus of teams, including partners, associates and support staff. While everyone else at that time had made their own collective deals and worked out terms, Ms. Rodgers was the only one in limbo.

23. Based on this impractical predicament, Ms. Rodgers ultimately exited with the DEF group and joined Chartwell on July 11, 2022 as Of Counsel in the General Liability and Casualty Defense group in Chartwell's newly established Atlanta office.

24. Chartwell's Atlanta office was managed by both Robert Luskin ("Luskin") and Karen Karabinos ("Karabinos").

25. It was widely known that Karabinos referred to herself and held herself out to be "Mama Bear" of the office.

26. Karabinos sent out the overwhelming majority of office updates and was subsequently made a Co-Managing Partner in charge of Human Resources.

27. Rodgers worked under the supervision of Partners Greene and Clark.

28. Ms. Rodgers did not receive clearly defined roles, expectations, or job duties for work on Greene's team. There was obvious lack of case management, standard operating procedures or operational guidelines for Greene's team.

29. In November 2022, after Greene had to be unexpectedly out of the office, Clark was left in charge, which caused greater chaos; there was no real leadership, guidance, structure or organization.

30. In December 2022, Clark acknowledged to Ms. Rodgers that Rodgers had been put in a position without much guidance and that it has been unfair to

Rodgers. Ms. Rodgers requested the implementation of weekly case meetings with Clark to create smoother flow of case management and to ensure assignments/tasks were clearly articulated and understood by both parties and to ensure compliance with deadlines. Ms. Rodgers also requested weekly case meetings with Greene.

31. Ms. Rodgers consistently requested more substantive work to maximize billing and production.

32. However, Ms. Rodgers' assignments were primarily drafting discovery responses and preparing draft emails and updates to clients for Greene and Clark's review, communications with plaintiff's counsel and preparing consent motions to extend discovery periods. This was not sustainable to meet or exceed billing requirements.

33. Ms. Rodgers specifically told Greene she needed to and was capable of doing more, including depositions of party and fact, as well as physician and expert witnesses, to which Greene acknowledged she knew Ms. Rodgers knew how to, but declined to give Ms. Rodgers those assignments. Greene told Ms. Rodgers Greene and Clark handle those types of assignments.

34. From the outset of her employment, Ms. Rodgers was subjected to different standards and treatment compared to similarly situated Caucasian and younger attorneys in the Atlanta office.

35. Despite being an experienced attorney with eighteen (18) years of practice, Ms. Rodgers was placed on a Performance Improvement Plan ("PIP") on March 31, 2023, after only eight (8) months of employment, marking the first time in her entire legal career she had been subjected to such action, while similarly situated and lower-performing Caucasian and younger attorneys received accommodations and support.

36. Specifically, on March 27, 2023, four (4) days prior to being placed on a PIP, Ms. Rodgers received an email from Greene, asking for suggestions to make the team's collective lives better. Ms. Rodgers responded the same day with examples and asked questions for clarity.

37. On March 28, 2023, Ms. Rodgers had a previously scheduled case status meeting with Greene in Greene's office, and no evidence of any issues were presented during that meeting. As Ms. Rodgers stood up to leave Greene's office, Ms. Rodgers was ordered by Greene to "Sit Down", at which point, Greene stated she reviewed Rodgers' March 27th email, then berated Ms. Rodgers, increased her volume, changed her tone and disposition, and told Ms. Rodgers for her purposes, she is essentially to do as she is told. Ms. Rodgers was severely demeaned during this encounter, and subjected to asking Greene for her permission to stand and leave the office.

38. The same day, on March 28, 2023, three (3) days prior to being issued a PIP, Ms. Rodgers went to Karen Karabinos, because of her clear management role and purported dedication to helping women, and made a report of Greene's behavior, which was in compliance with Chartwell's Handbook for reporting discriminatory behavior.

39. On March 29, 2023, Ms. Rodgers received an email from Greene asking Ms. Rodgers to provide her case list to determine assignments, as if Ms. Rodgers was going to be given more work. Instead, on March 31, 2023, Ms. Rodgers was issued the PIP.

40. At the time Ms. Rodgers was placed on a PIP, she only had ten (10) active cases; she had only taken one (1) deposition and attended only (1) inspection since her employment began at Chartwell. Ms. Rodgers had been given limited opportunities despite her numerous requests for more work and significant experience.

41. Despite the profound lack of opportunities for substantive work provided to Ms. Rodgers, she was doing everything she could and performing at the same level or at times exceeding the performance of others within the office.

42. Prior to Ms. Rodgers being placed on a PIP, the only specific training consisted of two (2) meetings:

    a. A lunch and learn power point presentation on only one (1) of Greene and Clark's client's case handling (in July or August 2022); and

    b. The first office associate meeting (in November 2022). This session included a paper handout with an itemized list for different types of cases. However, there was no designation on who does what from the list or specific expectations.

43. As a result, prior to being placed on a PIP, Ms. Rodgers had reached out to Dana Bennett, Chartwell's Chief Administrative Officer, and requested to participate in the firm's Partnering Program to get guidance on how to navigate the need for more work, more structure and organization. Ms. Rodgers did not receive a response.

44. Notwithstanding Greene's and Clark's lack of management and assignments to Ms. Rodgers, she was making her mark and finding her place at the firm. Prior to Ms. Rodgers being placed on a PIP, she had been involved in the hiring process for support staff, including review of resumes and participation in the interviews.

45. Partners from other offices, including Carmen Nicolau and Matt Hefflefinger, invited Ms. Rodgers to accompany them on client marketing trips, nominated her to join committees and extended invitations to attend conferences.

46. Moreover, just two (2) weeks prior to being placed on a PIP, Ms. Rodgers was highlighted by Chartwell for Women's History Month on March 17, 2023,

where she was featured with an article and photograph together with Greene addressing the specific topic of work life balance.

47. Prior to being placed on a PIP, Ms. Rodgers received no negative feedback from clients for any of her work product; instead, she received responses from clients, including Sarah Wolfe, praising and complementing the quality of her work

48. Further, just one (1) month prior to being placed on a PIP, Ms. Rodgers underwent the firm's Annual Review in February 2023, with no mention of performance issues, no mention of a PIP and no mention of the need for HR intervention.

49. Instead, during the Annual Review in February 2023, Equity Partner and Management Committee Member Elizabeth Cavallaro ("Cavallaro") acknowledged all of the transitions the Atlanta office had, and those Ms. Rodgers had and stated it sounded like Ms. Rodgers, Greene and Clark had a plan for going forward and for Ms. Rodgers to communicate with Greene and Clark if she had any questions or needed anything.

50. Chartwell demonstrated a pattern and practice of providing accommodations and retention efforts for younger, Caucasian attorneys that were denied to Ms. Rodgers:

   a. Managing Partner Robert Luskin approved Brittany Griner's request to transfer from Partner Pam Grimes, while Ms. Rodgers' repeated requests to transfer to Burrell, were denied. Moreover, despite her initial recruitment efforts and homage to him, Greene denied Burrell's specific requests for Ms. Rodgers to work for him.;

   b. Managing Partner Karen Karabinos requested Griner and Taylor Lacey create "wish lists" for Managing Attorney Luskin's review, and repeatedly asked them what they needed to be "happy";

    c. HR's Director of Employee Relations Jamie LaNatra sent Griner a complimentary wellness check-in email after only two (2) months, while no similar outreach was made to Ms. Rodgers;

    d. Managing Partner Karen Karabinos provided Katelyn Fischer with weekly billing submission accommodations instead of a PIP despite Fischer consistently failing to meet billable hour requirements; and

    e. Managing Partner Luskin also removed Avery Minnick from Partner Pam Grimes' team after her complaints of working with Grimes and allowed Minnick to begin working for him directly instead.

51. Additionally, Ms. Rodgers was subjected to discriminatory office hour requirements, being told she had to arrive at the office earlier than any other attorney in the Atlanta office, a requirement not imposed on any of her colleagues.

52. When Ms. Rodgers requested a transfer to work under a different Partner who specifically requested to work with her, Greene refused the transfer, a denial not imposed on younger Caucasian associates who made similar transfer requests.

53. Chartwell's claim that other attorneys were placed on PIPs is misleading, as any other PIP in the Atlanta office was issued after Ms. Rodgers' PIP was implemented and after she raised discrimination complaints to Managing Partner Karen Karabinos and Human Resources

54. As demonstrated by Chartwell's own internal documents, including a spreadsheet from Managing Attorney Robert Luskin stating that attorneys "trending below 2100" billable hours were highlighted in yellow, the overwhelming majority of attorneys in the Atlanta office, including Partners Greene and Clark, were highlighted in yellow, yet Ms. Rodgers was the only attorney placed on a PIP at that time.

55. The PIP was delivered to Ms. Rodgers by way of a Teams Meeting calendar invite from Human Resources Director of Employee Relations, Jamie LaNatra ("LaNatra"), who had never met Rodgers and had only been in her position for one (1) week at the time she summoned Rodgers. Rodgers was given only fourteen (14) minutes' notice before the meeting. LaNatra denied Rodgers' reply email requesting the purpose and an Agenda for the meeting. Instead, when Rodgers joined the meeting, Greene, Clark and LaNatra were on screen. LaNatra delivered verbal and electronic notice of the PIP to Rodgers, who was given only thirty (30) days to improve her performance or face termination, with a targeted improvement date of May 1, 2023.

56. In spite of these terms, Ms. Rodgers was ultimately not given the full time outlined in the PIP. Rather, by April 21, 2023, ten (10) days prior to the PIP end date, LaNatra informed Ms. Rodgers that Chartwell was "leaning towards termination" and this decision had been confirmed with HR Director Jennifer Majewski ("Majewski").

57. During her tenure at Chartwell, Ms. Rodgers was given a surgical recommendation for her diagnosis with Leiomyomas (uterine fibroids), a condition that substantially limited major life activities including reproductive functions, normal bodily functions, and her ability to work during symptomatic periods.

58. On or about October 1, 2022, Ms. Rodgers informed both Greene and Clark, in separate conversations in their respective offices, of her diagnosis of Leiomyomas (uterine fibroids) and the severe symptoms associated with her condition, including significant bleeding requiring frequent and urgent restroom access, episodes requiring her to pull over while driving to access restroom facilities, and inability to maintain regular office presence during symptomatic periods.

59. Ms. Rodgers explained that she had received a surgical recommendation but could not undergo the procedure because it would require a six-week recovery period that she felt she could not take based on her work responsibilities. Clark responded that she was familiar with such issues because she had a family member with fibroids and her own reproductive health struggles.

60. Despite Chartwell's Employee Handbook stating that the company "will make reasonable accommodations for the known disability of an otherwise qualified individual," neither Greene nor Clark engaged in the interactive process or offered any accommodations after being informed of Ms. Rodgers' disability.

61. On January 27, 2023, HR Director Jennifer Majewski acknowledged Ms. Rodgers' medical condition in an email to Cavallaro, instructing that if Ms. Rodgers brings up any medical or personal issues, Cavallaro should inform her she has an obligation to report that to HR and that Ms. Rodgers should contact Majewski to discuss.

62. Despite HR's acknowledged awareness of Ms. Rodgers' disability, no interactive process was initiated, and no reasonable accommodations were ever offered through the date of Ms. Rodgers' constructive discharge on September 5, 2023; instead, Greene used Ms. Rodgers' health issues to justify placing her on a PIP while younger Caucasian attorneys with performance issues received support, transfers, and weekly billing accommodations.

63. Throughout her employment, Ms. Rodgers was subjected to a hostile work environment based on her race, age, and disability that was severe and pervasive enough to alter the conditions of her employment.

64. Greene yelled at and repeatedly berated Ms. Rodgers in the office setting and told Ms. Rodgers that she could miss deadlines because of her Partner title while imposing strict deadlines on Ms. Rodgers, systematically excluded Ms. Rodgers from professional development opportunities provided to younger

Caucasian attorneys, and subjected Ms. Rodgers to discriminatory attendance requirements not imposed on any other attorney.

65. The hostile treatment was so pervasive that a co-worker independently told Ms. Rodgers "this firm needs to stop messing with you" and sent Ms. Rodgers information about a seminar titled "What to Do if You are Harassed or Discriminated Against at Work."

66. After Ms. Rodgers raised concerns about discriminatory treatment with Partner Karen Karabinos on March 28, 2023 and an African American male Partner, Burrell, requested that Ms. Rodgers work for him, Greene immediately retaliated by refusing the transfer request and placing Ms. Rodgers on a PIP on March 31, 2023.

67. The PIP was pretextual and retaliatory, as evidenced by:

   a. Ms. Rodgers receiving only thirty (30) days to improve while another attorney received forty days;

   b. LaNatra informing Ms. Rodgers on April 21, 2023, ten (10) days before the PIP's scheduled end, that Chartwell was "leaning towards termination" and this decision had been confirmed with HR Director Majewski; and

   c. The intensification of retaliation after Ms. Rodgers submitted detailed written rebuttals to HR on April 2, April 7, April 17, and April 21, 2023.

68. The escalation of retaliatory conduct following Ms. Rodgers' complaints forced her to seek help for the first time in her career from the State Bar of Georgia's Lawyer Assistance Program (LAP) and medical attention, resulting in her physician directing her to seek leave due to the severe emotional distress caused by the hostile work environment.

69. Ms. Rodgers suffered a total breakdown, including but not limited to: disassociation, difficulty driving (i.e., missed exits and sitting at green lights),

mental turmoil, loss of focus (i.e., left appliance on which caused fire), various physical reactions, constant crying, stress and financial hardship.

70. Ms. Rodgers was constructively discharged on September 5, 2023, when the working conditions became so intolerable due to Defendant's discriminatory, hostile, and retaliatory conduct that a reasonable person in Ms. Rodgers' position would have felt compelled to resign.

## COUNT I

## RACE DISCRIMINATION IN VIOLATION OF TITLE VII (42 U.S.C. § 2000e-2(a)(1))

71. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

72. Defendant discriminated against Plaintiff on the basis of her race, African American, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1), which makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."

73. Plaintiff establishes her prima facie case of race discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), by demonstrating that she is a member of a protected class as an African American woman, she was qualified for her position and met Defendant's legitimate expectations with eighteen (18) years of legal experience, she suffered adverse employment actions including placement on a Performance Improvement Plan and constructive discharge, and the adverse actions occurred under circumstances giving rise to an inference of

discrimination as similarly situated employees outside her protected class were treated more favorably.

74. The inference of discrimination is demonstrated by the stark disparities in Defendant's workforce composition and treatment of African American attorneys, as evidenced by the fact that of Defendant's 235 attorneys at the time of Plaintiff's PIP placement, only one (1) was an African American female Partner and two (2) were African American male Partners, reflecting minimal African American representation in leadership positions despite over twenty years in business.

75. Defendant subjected Plaintiff to disparate treatment by imposing different terms and conditions of employment based on her race, including placing her on a PIP while similarly situated Caucasian attorneys who failed to meet billable hour requirements received accommodations and support, denying her transfer requests while granting similar requests from Caucasian attorneys, and imposing discriminatory attendance requirements not imposed on any other attorney in the Atlanta office.

76. Defendant failed to enforce its own anti-discrimination policies as outlined in its Employee Handbook, which states that "Chartwell Law will conduct an investigation into any complaint or report of discriminatory harassment" and will take "prompt and appropriate action," yet when Plaintiff reported discriminatory treatment, Defendant conducted no investigation and instead escalated its retaliatory conduct.

77. The evidence demonstrates that Defendant's proffered legitimate, nondiscriminatory reasons for the adverse employment actions are pretextual, as shown by the timing of the PIP immediately following Plaintiff's complaints of discriminatory treatment, the false and inaccurate information used to justify the PIP, and the disparate treatment of similarly situated

Caucasian employees who were not subjected to similar disciplinary actions despite comparable or worse performance issues.

78. Defendant's discriminatory conduct was intentional, willful, and in reckless disregard of Plaintiff's federally protected rights under Title VII, as evidenced by Defendant's knowledge of its legal obligations, its written anti-discrimination policies, and its deliberate choice to treat Plaintiff differently based on her race while accommodating similarly situated Caucasian employees.

79. Defendant's pattern of discrimination was further evidenced by multiple pending EEOC charges against Chartwell and its systemic failure to comply with federal anti-discrimination laws despite maintaining written policies prohibiting such conduct.

80. Pursuant to 42 U.S.C. § 2000e-5(g) and 42 U.S.C. § 1981a, Plaintiff is entitled to compensatory and punitive damages because Defendant engaged in discriminatory practices with malice or with reckless indifference to Plaintiff's federally protected rights, as demonstrated by Defendant's deliberate indifference to its known legal obligations and its conscious disregard of the discriminatory treatment Plaintiff endured.

81. As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to lost wages, lost employment benefits, severe emotional distress requiring ongoing medical treatment, and irreparable harm to her professional reputation and career advancement opportunities.

## COUNT II

## AGE DISCRIMINATION IN VIOLATION OF THE ADEA (29 U.S.C. § 623(a)(1))

82. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

83. Defendant discriminated against Plaintiff on the basis of her age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a)(1), which makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."

84. At all relevant times, Plaintiff was over 40 years old and thus a member of the class protected by the ADEA, which protects persons 40 years of age or older pursuant to 29 U.S.C. § 631.

85. Plaintiff establishes her prima facie case of age discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as applied to ADEA cases, by demonstrating that she was a member of the protected class at 44 years old, she was qualified for her position and met Defendant's legitimate expectations, she suffered adverse employment actions including placement on a Performance Improvement Plan and constructive discharge, and these adverse actions occurred under circumstances giving rise to an inference of age discrimination.

86. The inference of age discrimination is demonstrated by Defendant's pattern of favoring significantly younger employees, including:

    a. granting transfer requests from younger attorneys while denying Plaintiff's requests;

b. providing weekly billing accommodations to younger associates who failed to meet requirements while placing Plaintiff on a PIP;

c. allowing younger associates to create "wish lists" of improvements they desired;

d. sending complimentary wellness and check-in emails to younger employees while subjecting Plaintiff, with eighteen (18) years of experience, to a PIP after only eight (8) months of employment.

87. Defendant's proffered legitimate, nondiscriminatory reasons for the adverse employment actions are pretextual, as demonstrated by the timing of the PIP immediately following Plaintiff's complaints, the false and inaccurate information used to justify the PIP, and the disparate treatment of younger employees who were not subjected to similar disciplinary actions despite comparable performance issues.

88. The ADEA requires proof that age was the "but for" cause of the adverse employment action, as established in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), and the evidence demonstrates that Plaintiff's age was a determining factor in Defendant's decision to place her on a PIP and ultimately force her constructive discharge, as younger attorneys with comparable or worse performance issues were not subjected to similar disciplinary actions.

89. Defendant's conduct was willful within the meaning of 29 U.S.C. § 626(b), as Defendant knew or showed reckless disregard for whether its conduct was prohibited by the ADEA, evidenced by Defendant's awareness of federal anti-discrimination laws, its written policies prohibiting age discrimination, and its deliberate choice to treat Plaintiff differently based on her age while accommodating younger employees with performance issues.

90. The willful nature of Defendant's violation is further demonstrated by Defendant's treatment of Plaintiff's extensive experience as a negative factor

rather than an asset, placing her on a PIP after only eight (8) months despite her eighteen (18) years of legal experience, while simultaneously advocating for and mentoring younger, less experienced attorneys who were provided accommodations and support rather than disciplinary measures.

91. Pursuant to 29 U.S.C. § 626(b), Plaintiff is entitled to liquidated damages for Defendant's willful violation of the ADEA, which provides that "liquidated damages shall be payable only in cases of willful violations" and "shall be in an amount equal to the amount of actual damages," effectively doubling the damage award for willful violations.

92. Plaintiff is entitled to all relief available under the ADEA, including but not limited to back pay, front pay in lieu of reinstatement, liquidated damages equal to the amount of back pay for Defendant's willful violation, prejudgment interest on back pay, and all other legal and equitable relief available under 29 U.S.C. § 626(b) and (c).

93. As a direct and proximate result of Defendant's unlawful age discrimination, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to lost wages, lost employment benefits, severe emotional distress, humiliation, and irreparable harm to her professional reputation and career advancement opportunities.

## COUNT III

## DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA (42 U.S.C. § 12112(a) and (b)(5)(A))

94. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

95. Plaintiff is an individual with a disability as defined by 42 U.S.C. § 12102(1), having been diagnosed with Leiomyomas (uterine fibroids), a physical impairment that substantially limits major life activities including reproductive functions, bladder and bowel functions, and the ability to work during symptomatic periods.

96. At all relevant times, Plaintiff was qualified to perform the essential functions of her position as Of Counsel with or without reasonable accommodation, having successfully performed her job duties for eighteen (18) tyears when not experiencing acute symptoms.

97. Defendant discriminated against Plaintiff in violation of 42 U.S.C. § 12112(a) and (b), which prohibit discrimination against qualified individuals with disabilities in employment terms, conditions, and privileges, including the failure to make reasonable accommodations to known physical limitations.

98. Beginning in October 2022, Plaintiff informed supervisors Greene and Clark of her diagnosis, symptoms, surgical recommendation, and work impact, including her need for medical appointments and inability to maintain regular office presence during symptomatic periods, thereby satisfying the predicate requirement for triggering the interactive process under *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040 (8th Cir. 2005).

99. Despite actual knowledge of Plaintiff's disability, confirmed by HR Director Jennifer Majewski's January 27, 2023 email acknowledging Plaintiff's medical condition and instructing Cavallaro on reporting obligations, Defendant failed to engage in the interactive process required by 29 C.F.R. § 1630.2(o)(3). Defendant impeded this process through its failure to participate in good faith, its failure to help determine necessary accommodations, and its obstruction of the communication process despite knowing of Plaintiff's disability and need for accommodation. See *Bultemeyer v. Fort Wayne*

*Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996) (holding that "courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary").

100.    Instead of providing reasonable accommodations, Defendant used Plaintiff's disability as grounds for imposing a Performance Improvement Plan, while similarly situated non-disabled employees with performance issues received accommodations and support.

101.    Defendant's failure to engage in the interactive process resulted in a failure to identify appropriate accommodations, constituting an ADA violation under *Rehling v. City of Chicago*, 207 F.3d 1009 (7th Cir. 2000). Reasonable accommodations that could have been provided include flexible scheduling for medical appointments, work-from-home options during symptomatic periods, modified attendance requirements, temporary workload reduction, and leave for surgical procedure and recovery.

102.    Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights, as evidenced by its documented knowledge of ADA obligations in its Employee Handbook, HR Director Majewski's acknowledgment of reporting obligations, and its deliberate choice to impose a PIP rather than engage in the interactive process.

103.    Defendant subjected Plaintiff to disparate treatment by imposing a PIP while accommodating non-disabled employees, denying her transfer requests while granting them for others, and creating a hostile work environment that forced her constructive discharge.

104.    As a direct and proximate result of Defendant's unlawful discrimination and failure to accommodate, Plaintiff has suffered substantial damages

including lost wages, lost benefits, severe emotional distress, and irreparable harm to her professional reputation.

105.    Pursuant to 42 U.S.C. § 12117(a) and § 1981a, Plaintiff is entitled to compensatory damages for pecuniary and non-pecuniary losses, including back pay, front pay, lost benefits, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life, as well as punitive damages for Defendant's malicious or recklessly indifferent conduct.

## COUNT IV

## RACE DISCRIMINATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866 (42 U.S.C. § 1981)

106.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

107.    Defendant violated 42 U.S.C. § 1981 ("Section 1981") by allowing Plaintiff to work under terms and conditions of employment that differed from similarly situated employees.

108.    As a result of Defendant's deliberate, intentional, and unlawful activities as detailed above, Plaintiff has been harmed and injured, and she is entitled to an award of money damages in an amount to be determined, including an award of punitive damages, and attorney's fees.

109.    Plaintiff establishes her prima facie case of race discrimination under Section 1981 by demonstrating that she is a member of a protected class as an African American woman, she was qualified for her position and met Defendant's legitimate expectations with eighteen (18) years of legal experience, she suffered adverse employment actions including placement on a Performance Improvement Plan and constructive discharge, and race was

the "but for" cause for the adverse actions that occurred as similarly situated employees outside her protected class were treated more favorably.

110.    The "but for" cause of discrimination is demonstrated by the stark disparities in Defendant's workforce composition and treatment of African American attorneys, as evidenced by the fact that of Defendant's 235 attorneys at the time of Plaintiff's PIP placement, only one (1) was an African American female Partner and two (2) were African American male Partners, reflecting minimal African American representation in leadership positions despite over twenty years in business.

111.    Defendant subjected Plaintiff to disparate treatment by imposing different terms and conditions of employment based on her race, including placing her on a PIP while similarly situated Caucasian attorneys who failed to meet billable hour requirements received accommodations and support, denying her transfer requests while granting similar requests from Caucasian attorneys, and imposing discriminatory attendance requirements not imposed on any other attorney in the Atlanta office.

112.    Defendant failed to enforce its own anti-discrimination policies as outlined in its Employee Handbook, which states that "Chartwell Law will conduct an investigation into any complaint or report of discriminatory harassment" and will take "prompt and appropriate action," yet when Plaintiff reported discriminatory treatment, Defendant conducted no investigation and instead escalated its retaliatory conduct.

113.    The evidence demonstrates that Defendant's proffered legitimate, nondiscriminatory reasons for the adverse employment actions are pretextual, as shown by the timing of the PIP immediately following Plaintiff's complaints of discriminatory treatment, the false and inaccurate information used to justify the PIP, and the disparate treatment of similarly situated

Caucasian employees who were not subjected to similar disciplinary actions despite comparable or worse performance issues.

114.     Defendant's discriminatory conduct was intentional, willful, and in reckless disregard of Plaintiff's federally protected rights under Section 1981, as evidenced by Defendant's knowledge of its legal obligations, its written anti-discrimination policies, and its deliberate choice to treat Plaintiff differently based on her race while accommodating similarly situated Caucasian employees.

115.     Defendant's pattern of discrimination is further evidenced by multiple pending EEOC charges against Chartwell and its systemic failure to comply with federal anti-discrimination laws despite maintaining written policies prohibiting such conduct.

116.     Pursuant to 42 U.S.C. § 2000e-5(g) and 42 U.S.C. § 1981a, Plaintiff is entitled to compensatory and punitive damages because Defendant engaged in discriminatory practices with malice or with reckless indifference to Plaintiff's federally protected rights, as demonstrated by Defendant's deliberate indifference to its known legal obligations and its conscious disregard of the discriminatory treatment Plaintiff endured.

117.     As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to lost wages, lost employment benefits, severe emotional distress requiring ongoing medical treatment, and irreparable harm to her professional reputation and career advancement opportunities.

## COUNT IV

## RETALIATION IN VIOLATION OF TITLE VII (42 U.S.C. § 2000e-3(a)), THE ADEA (29 U.S.C. § 623(d)), THE ADA (42 U.S.C. § 12203(a)), AND THE CIVIL RIGHTS ACT OF 1866 (42 U.S.C. § 1981)

118.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

119.    Defendant retaliated against Plaintiff for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), the Age Discrimination in Employment Act, 29 U.S.C. § 623(d), the Americans with Disabilities Act, 42 U.S.C. § 12203(a), and the Civil Rights Act of 1866, 42 U.S.C. § 1981, which prohibit employers from discriminating against any individual because such individual "has opposed any practice made an unlawful employment practice" or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under these statutes.

120.    Plaintiff engaged in protected activity when she notified Greene, Clark and Defendant's Human Resources Department of her disability and requested reasonable accommodations beginning in October 2022, opposed discriminatory treatment based on her race, age, and disability through internal complaints beginning with Karen Karabinos on March 28, 2023, and filed an EEOC charge on September 18, 2023, alleging race, age, and retaliation, subsequently filing an amended EEOC charge adding disability discrimination claims.

121.    Defendant was aware of Plaintiff's protected activity through its receipt of notice from the EEOC and through Plaintiff's internal complaints to Human Resources and subjected her to materially adverse employment actions including placement on a pretextual Performance Improvement Plan and constructive discharge.

122.    A causal connection exists between Plaintiff's protected activity and the adverse actions, demonstrated by temporal proximity and the pattern of escalating retaliation: Defendant placed Plaintiff on a Performance

Improvement Plan three (3) days following her complaints of discrimination, escalated hostile treatment after learning of her EEOC charge, and imposed increasingly intolerable working conditions designed to force her resignation.

123.    Defendant's materially adverse actions would dissuade a reasonable worker from making or supporting a charge of discrimination, including imposing a baseless Performance Improvement Plan with impossible performance standards, denying requests for reasonable accommodations despite medical documentation, subjecting her to heightened scrutiny not applied to employees who had not engaged in protected activity, and creating working conditions so intolerable that a reasonable person would have been compelled to resign.

124.    Defendant's proffered legitimate, non-retaliatory reasons for the adverse actions are pretextual, as evidenced by:

   a. Plaintiff's successful performance before engaging in protected activity;

   b. False and inaccurate information in the PIP that Defendant knew or should have known was incorrect;

   c. Disparate treatment compared to similarly situated employees who had not engaged in protected activity;

   d. Defendant's deliberate escalation of adverse actions following Plaintiff's EEOC filing despite its knowledge that retaliation is prohibited by federal law as stated in its own Employee Handbook.

125.    Pursuant to 42 U.S.C. § 2000e-5(g), 29 U.S.C. § 626(b), and 42 U.S.C. § 12117(a), Plaintiff is entitled to compensatory damages for pecuniary and non-pecuniary losses, including back pay, front pay, lost benefits, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life

## COUNT V

## HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII (42 U.S.C. § 2000e-2(a)(1)) AND THE ADA (42 U.S.C. § 12112(a))

126.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

127.    Defendant subjected Plaintiff to a hostile work environment based on her race and disability in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and the Americans with Disabilities Act, 42 U.S.C. § 12112(a), which prohibit employers from discriminating against any individual with respect to the terms, conditions, or privileges of employment because of such individual's race or disability.

128.    Plaintiff establishes her hostile work environment claim by demonstrating that she is a member of protected classes as an over forty, African American woman with disabilities, that she was subjected to unwelcome harassment based on her age, race and disability, that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment, that the harassment was both objectively and subjectively offensive, and that Defendant knew or should have known of the harassment and failed to take prompt remedial action.

129.    The hostile work environment manifested through Defendant's systematic differential treatment based on age, race and disability, including: (a) subjecting Plaintiff to heightened scrutiny not applied to younger, Caucasian attorneys, denying her opportunities for advancement while promoting less qualified Caucasian attorneys, and isolating her from firm activities and communications; (b) deliberate indifference to Plaintiff's

medical needs, including denying reasonable accommodations despite medical documentation, requiring Plaintiff to perform job duties that exacerbated her medical conditions, publicly questioning the legitimacy of her disability, and treating Plaintiff as a burden rather than a valued employee due to her disability status.

130.    The harassment Plaintiff endured was severe and pervasive, occurring on a daily basis over an extended period and affecting every aspect of her employment, including work assignments, performance evaluations, interactions with supervisors and colleagues, access to firm resources, and opportunities for professional development, creating an environment that a reasonable person would find hostile, abusive, and intolerable.

131.    Defendant had actual and constructive knowledge of the hostile work environment through Plaintiff's multiple complaints to Human Resources, formal requests for accommodations with supporting medical documentation, reports to supervising and managing attorneys about the discriminatory treatment, and the open and obvious nature of the differential treatment she received. Despite this knowledge and its own anti-discrimination policies requiring prompt investigation and remedial action, Defendant failed to investigate Plaintiff's complaints, allowed the hostile conduct to continue and escalate, and retaliated against Plaintiff for reporting the hostile work environment rather than addressing the underlying discriminatory conduct.

132.    The hostile work environment was so severe and pervasive that it culminated in Plaintiff's constructive discharge when the discriminatory conditions became so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign, constituting a tangible employment action for which Defendant is strictly liable under federal anti-discrimination law.

133.    Defendant's maintenance of the hostile work environment was intentional, willful, and in reckless disregard of Plaintiff's federally protected rights, as demonstrated by Defendant's conscious disregard of its legal obligations, its failure to enforce its own anti-discrimination policies, and its deliberate indifference to the hostile conditions Plaintiff endured despite her repeated complaints.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that Defendant's actions violated Title VII, the ADEA, the ADA and Section 1981;

B. Permanently enjoin Defendant from engaging in discrimination, retaliation, and maintaining hostile work environments based on race, age, or disability;

C. Award Plaintiff back pay, front pay, lost benefits, and prejudgment interest;

D. Award Plaintiff compensatory damages for emotional distress, humiliation, embarrassment, and damage to professional reputation;

E. Award Plaintiff punitive damages to punish Defendant's willful, malicious, and reckless conduct and to deter future violations;

F. Award Plaintiff reasonable attorneys' fees, expert witness fees, and costs pursuant to 42 U.S.C. § 2000e-5(k), 29 U.S.C. § 626(b), and 42 U.S.C. § 12205;

G. Award prejudgment and post-judgment interest on all monetary awards;

H. Grant such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 26th day of September, 2025.

*/s/ Christine A. Forsythe*
Christine A. Forsythe
Georgia Bar No.: 321456
*Attorney for Plaintiff*

**The Forsythe Law Firm, LLC**
1050 Crown Pointe Parkway
Suite 1240
Atlanta, GA 30338
Phone: (404) 476-2717
Fax: 770-212-9213
Email: christine@forsythelawfirm.com

Counsel for Plaintiff certifies that this Complaint complies with paper, margin and

font requirements as approved by the court in LR 5.1B.

*/s/ Christine A. Forsythe*
Christine A. Forsythe
Georgia Bar No.: 321456
*Attorney for Plaintiff*

**The Forsythe Law Firm, LLC**
1050 Crown Pointe Parkway
Suite 1240
Atlanta, GA 30338
Phone: (404) 476-2717
Fax: 770-212-9213
Email: christine@forsythelawfirm.com